**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

|

**SEA SEARCH ARMADA** |
15600 NE 8th St. |
B1-462 |
Bellevue, WA 98008 |
|
     Plaintiff, |
|
     v. |     Civil Action No. _____
|
**THE REPUBLIC OF COLOMBIA** |
Serve:  Ministerio de Relaciones Exteriores |
Calle 10 NO.5-51 |
Palacio de San Carlos |
Bogota, Colombia |
|
     Defendant. |
_____ |

## COMPLAINT

**COMES NOW** Plaintiff Sea Search Armada ("SSA"), by and through undersigned counsel, and hereby respectfully asks this Honorable Court for judgment against Defendant The Republic of Colombia ("Colombia" or "GOC") on the grounds and in the amounts as hereinafter set forth.  In support of such claims, Plaintiff hereby avers as follows:

## Jurisdiction and Venue

1.  This Court has jurisdiction to entertain this action pursuant to 28 U.S.C. § 1330 in that this litigation is a nonjury civil action against a foreign state and there is no immunity against such suit on the part of the foreign state.  See 28 U.S.C. § 1605.

2.   Venue in this Court is proper pursuant to 28 U.S.C. § 1391(f)(4) in that the Defendant is a foreign state.

**Parties**

3.   Plaintiff SSA is a Delaware corporation engaged in the business of ocean salvage worldwide.

4.   Defendant Colombia is a foreign state as that term is defined in 28 U.S.C. § 1603.

**Factual Background**

**A. The Galleon San Jose**

5.   On June 8, 1708, the galleon *San Jose* was sunk by the British navy during a naval battle near the coast of Colombia.  Based on archival research conducted by SSA, at the time the *San Jose* was sunk, it was carrying cargo from the Spanish Viceroyalty of *Tierra Firma*, primarily from what is now Peru, via the Isthmus of Panama.  Furthermore, based on SSA's research the San Jose is located on the edge of the Continental Shelf at a depth of approximately 1,000 feet.

6.   Once again based on SSA's archival research, the cargo of the *San Jose* was precious metal in the forms of coins and bullion, which were privately owned by Peruvian and European merchants.  Based on SSA's research and analysis by independent experts in mineral values, the current value of the cargo is between $4 billion and $17 billion.

7.   In 1980, the Glocca Morra Co. ("GMC") requested and was granted permission from an agency of Colombia, the *Direccion General Maritima* ("DIMAR") to explore the Colombian Continental Shelf for shipwrecks.

8.   Colombia has provided DIMAR with the authority to regulate and control certain maritime activities including, "the exploration of antiquities and treasures of sunken ships and shipwrecks [and] put forward the formalities to enter into the corresponding extraction or recovery contracts."   By Resolution 48 of 1980, DIMAR granted GMC's request.

9.   Between 1980 and 1985, GMC identified six (6) locations thought to be the sites of ancient shipwrecks, and reported them to Colombia.   Specifically, in December 1981, GMC located what it believed to be the *San Jose* on the Continental Shelf off the coast of Colombia and this location was formally filed in 1982 with Colombia under the terms of Resolution 48.

10.   GMC and Colombia then engaged in negotiations for a contract to recover the *San Jose*.   The parties eventually reached an agreement whereby GMC would receive thirty five percent (35 %) of the treasures recovered from the site.   GMC subsequently assigned or transferred its rights under its agreement with Colombia and its rights in the treasure found at the *San Jose* site.   Subsequently SSA initiated preliminary identification surveys and conducted initial salvage operations retrieving pieces of timber and other materials from the *San Jose* site.   Despite its accord with SSA, the Government of Colombia delayed signing the written agreement it had drafted, and eventually refused to sign the offer it had made to SSA.

11.   Despite the terms of the agreement between GMC (and its assignor SSA) and Colombia, the GOC refused to permit SSA to perform full salvage operations at the *San Jose* site.

12.   Subsequently in 1984 the Colombian Parliament enacted a law giving Colombia all rights to treasure salvaged from the San Jose site eliminating all of SSA's property rights in the treasure (the "Seizure Law").  The Seizure Law provided that SSA would receive only a five percent (5%) finder's fee and that this finder's fee would be taxed at a rate of forty-five percent (45%).

13.   Believing that the retroactive Seizure Law violated the Colombian Constitution as well as international and United States law, after fruitless negotiations with Colombia to modify the Seizure Law, in 1989 SSA filed suit against Colombia in the Circuit Court of Barranquilla, Colombia and later in the Colombian Constitutional Court.

14.   Subsequently on March 10, 1994, the Colombian Constitutional Court ruled in SSA's favor finding that the Seizure Law was unconstitutional and void.  Based on this ruling, on July 6, 1994, the Circuit Court entered judgment finding that the treasures of the *San Jose* were owned in equal (50% and 50%) shares by Colombia and SSA.

15.   Subsequently, Colombia appealed the Circuit Court's decision to the Colombian Superior Court.  In 1997 Colombia's appeal was denied.

16.   Thereafter, Colombia appealed to the Supreme Court of Colombia (the highest judicial authority in that country).  On July 5, 2007 the Colombian Supreme Court issued a ruling (the "Colombian Ruling") denying Colombia's appeal and finding that Colombia and SSA owned any treasures recovered from the *San Jose* site in equal shares.

17.   Following the Colombian Ruling, The GOC refused to engage in good faith discussions with SSA concerning the initiation of joint salvage operations of the San Jose.

18.   Therefore, in March 5, 2010 following nearly three years of GOC sophistry and delays since the Supreme Court ruling, the Managing Director of SSA proposed to President Uribe of Colombia that they cooperate in a joint recovery of the San Jose:

> "As the legal representative of the company Sea Search Armada, permit me to respectfully propose a joint recovery effort, with previously agreed upon rules, of the shipwreck whose property was defined by the Supreme Court of Justice of Colombia in a July 5, 2007 ruling.
>
> We hope to obtain your approval Mr. President, and we place ourselves at your disposal to initiate the pertinent conversations according to the policies set forth by the Supreme Court, in a ruling that honored the Colombian justice system.
>
> "If your answer is not affirmative, or if we receive no answer within 30 days, we will take that to mean that your government is not interested in recovering the shipwreck in the proposed form.  As common and undivided owners, in equal parts, of the treasures that may be found therein, we will unilaterally begin the preparations to recover that which the judicial decision declares belongs to us."

19.   At the end of 30 days, the office of President Uribe replied, to the effect that the SSA letter cited above didn't officially exist because it wasn't in Spanish, the official language of Colombia.  SSA's Colombian lawyer, Danilo Devis, immediately prepared a similar notice in Spanish and had it delivered to the office of the President.

20.   In anticipation of initiating the salvage process, SSA began the process of hiring salvage contractors to perform the actual recovery of SSA's property.  SSA entered into a contract for equipment and oceanographic survey consultation (including an American flagged vessel) with Sea Trepid International, LLC, a company located in Louisiana.

21.   These operations would have employed at least 20 U.S. residents through the Louisiana subcontractor.  Furthermore, given that the majority of SSA's shareholders and investors are located in the United States, SSA's property salvaged from the *San Jose*

would have been brought to the United States for exposition and deposited in United States financial institutions.

22.   Subsequently, on April 27, 2010 the Legal Secretary to the President replied to SSA's proposal "*on the specific instruction of the honorable President of the Republic,*" with a threat to use military force if SSA attempted to access its property.  The letter went on to state that SSA is prohibited from visiting its property without prior approval of the GOC.  Legal Secretary Del Castillo's letter ends with the following threat:

> "Considering that this concerns the defense of the integrity of Colombian territory, as well as assets owned by the Nation, the **National Armed Forces will prevent the realization of unauthorized activities in jurisdictional maritime areas....**" (Emphasis added.)

23.   Based on the threats made in the April 27, 2010 letter, SSA's salvage contractors refused to honor their agreements to engage in salvage operations and SSA lost substantial sums invested in the salvage preparations.

## Count I

### (Tortious Interference with Contract)

24.  Plaintiff incorporates by reference paragraphs 1 through 23 above.

25.   In anticipation of initiating the salvage process, SSA began the process of hiring salvage contractors to perform the actual recovery of SSA's property.

26.   To further these operations, SSA entered into a contract for equipment and oceanographic survey consultation (including an American flagged vessel) with Sea Trepid International, LLC, a company located in Louisiana.

27. The Defendant was aware of these contractual agreements and anticipated business relationships between SSA and third parties.

28. The Defendant's actions and threat as expressed in its letter, dated April 27, 2010, demonstrate Defendant's intent to cause SSA's partners to breach their agreements with SSA and terminate their business relationships with the Plaintiff.

29. As a result of the GOC's actions, SSA has suffered damages including the loss of amounts invested in the preparation for salvage operations as well as funds expended in responding to the GOC's actions and threats.

30. SSA respectfully requests that the Court render judgment in its favor in the amount of $17 billion compensatory damages, the Plaintiff's costs to bring this suit, attorneys' fees, and such other relief as the Court deems appropriate.

## Count II

### (Tortious Interference with Business Relationships)

31. Plaintiff incorporates by reference paragraphs 1 through 30 above.

32. In anticipation of initiating the salvage process, SSA began the process of hiring salvage contractors to perform the actual recovery of SSA's property.

33. To further these operations, SSA entered into a contract for equipment and oceanographic survey consultation (including an American flagged vessel) with Sea Trepid International, LLC, a company located in Louisiana.

34. The Defendant was aware of these contractual agreements and anticipated business relationships between SSA and third parties.

35.   The Defendant's actions and threat as expressed in its letter, dated April 27, 2010, demonstrate Defendant's intent to cause SSA's partners to breach their agreements with SSA and terminate their business relationships with the Plaintiff.

36.   As a result of the GOC's actions, SSA has suffered damages including the loss of amounts invested in the preparation for salvage operations as well as funds expended in responding to the GOC's actions and threats.

37.   SSA respectfully requests that the Court render judgment in its favor in the amount of $17 billion compensatory damages, the Plaintiff's costs to bring this suit, attorneys' fees, and such other relief as the Court deems appropriate.

**WHEREFORE** Plaintiff respectfully request judgment in the amounts requested.

## JURY TRIAL DEMANDED

Respectfully submitted,

Date:  April 25, 2013

By:  _/s/James S. DelSordo_____
James S. DelSordo, Esq.
DC Bar No. 498507
Argus Legal, LLC
9255 Center St., Suite 307
Manassas, Virginia 20110
(703) 368-8770
fax (703) 368-8772

Counsel for Plaintiff Sea Search Armada